**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 4, 2024

*González, C.J.*

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 4, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 101171-7 |
| Appellant/Cross Respondent, | |
| | EN BANC |
| v. | |
| | Filed: April 4, 2024 |
| AUSTIN RIVER KELLER, | |
| Respondent/Cross Appellant. | |

GORDON MCCLOUD, J.— On May 9, 2020, Austin River Keller drove his car into a ditch and later failed a breath alcohol test. That started a chain of events that led the Kitsap County District Court to suppress—to exclude from evidence in court—breath alcohol test results produced from the Dräger Alcotest 9510 machines in Keller's case and in all other DUI (driving while under the influence of an intoxicant) cases in Kitsap County District Court. The district court concluded that those breath test results violated state statutes and regulations and, hence, that the State would be unable to lay a foundation for their admission under this court's precedent and our state's evidence rules.

The district court is correct that state law places strict limits on the admission of breath test results into evidence. A breath test is "valid" if it is performed "according to methods approved by the state toxicologist." RCW 46.61.506(3). And a breath test is admissible only if the breath samples "agree to within plus or minus ten percent of their mean to be determined by the method approved by the state toxicologist." RCW 46.61.506(4)(a)(vi). The district court is also correct that in 2010, the state toxicologist "approved" "the method" for performing that calculation; it was memorialized in former WAC 448-16-060 (2010). That method required the mean of the four individual test results[1] to be "rounded" to the nearest four decimal places prior to determining the plus or minus 10 percent range. Former WAC 448-16-060. And, importantly, the district court is also correct that despite those statutes and regulations, the Dräger machine has *never* rounded the mean before calculating the plus or minus 10 percent range. Instead, the Dräger was programmed to truncate the mean before performing that calculation.

But the district court erred in ruling that those statutes and regulations require the Dräger machine *itself* to perform the mean and the plus or minus 10 percent range calculation in accordance with former WAC 448-16-060's rounding

---

[1] The Dräger Alcotest 9510 takes two breath samples from the subject and performs two tests on each sample, yielding four results.

method. It therefore erred in concluding that the machine's failure to do those necessary mathematical calculations itself rendered the results invalid and inadmissible under RCW 46.61.506, *State v. Baker*,[2] and our evidence rules.

We therefore reverse. We hold that the relevant statutes and regulations do not require the Dräger machine itself to perform the mean and the plus or minus 10 percent range calculation at the time of the test. As the State acknowledges, the State must certainly comply with those statutes and regulations. But it can establish those required pieces of the foundation for admission of breath test results by doing the math discussed above in a different manner (as long as that different manner meets all other rules on admission of evidence in a criminal trial).

We reverse the district court's evidentiary rulings and suppression order and remand for further proceedings consistent with this opinion.[3]

FACTS AND PROCEDURAL HISTORY

I.      Background on alcohol intoxication and breath testing instruments

Before discussing the specifics of this case, we provide some necessary background on alcohol intoxication and the breath testing instruments involved

---

[2] 56 Wn.2d 846, 852, 355 P.2d 806 (1960).

[3] The state toxicologist formally amended WAC 448-16-060 in November 2022 to approve of the truncation method. Wash. St. Reg. 22-21-032 (Nov. 6, 2022). The State argues in the alternative that we should apply amended WAC 448-16-060 retroactively. Because we conclude the breath test results are admissible even under the former version of WAC 448-16-060, we need not reach the State's alternative argument.

here. Alcohol causes impairment by impacting the function of the central nervous system, particularly the brain. *State v. Brayman*, 110 Wn.2d 183, 187, 751 P.2d 294 (1988). Alcohol reaches the central nervous system through the blood. *Id.* Once in the blood, alcohol is also transferred from the blood into the deep alveolar sacs of the lungs, where it is expelled from the body through the breath. *Id.* at 189. Thus, there is "a reasonable and substantial relationship between breath alcohol and impairment." *Id.* at 195. But that reasonable and substantial relationship exists only between deep lung alveolar breath and impairment, not between mouth breath and impairment. *Id.*; Clerk's Papers (CP) at 48 (Finding of Fact (FF) 5.1). Breath alcohol content (BrAC) testing instruments are therefore designed to measure the alcohol in this deep lung air, not the alcohol in mouth breath. *Brayman*, 110 Wn.2d at 188.

Instruments for testing breath alcohol levels have been used in Washington for decades, starting with the Breathalyzer. *Baker*, 56 Wn.2d 846. The Breathalyzer analyzed a breath sample using the infrared spectroscopy method. *Id.* at 851-52 (describing the method).

In *Baker*, this court first established the foundational requirements for admitting breath tests performed by a Breathalyzer instrument into evidence. *Id.* at 852. We held that Breathalyzer results were inadmissible unless the State could show that (1) the instrument was properly checked and in proper working order at

the time of the test, (2) the chemicals used were of the correct kind and proportion, (3) the subject had nothing in their mouth at the time of the test, and (4) the test was given by a qualified operator and in the proper manner. *Id.*

The legislature granted authority to the state toxicologist to approve methods for maintaining Breathalyzer instruments and administering Breathalyzer tests. *State v. Peterson*, 100 Wn.2d 788, 789-90, 674 P.2d 1251 (1984). We ruled that the State had to comply with those toxicologist-approved regulations and with the *Baker* requirements for the Breathalyzer results it offered to be admitted into evidence. *Id.*

Eventually, the DataMaster instrument replaced the Breathalyzer, and a similar set of foundational requirements was promulgated for that machine in chapter 44-12 WAC. *City of Seattle v. Allison*, 148 Wn.2d 75, 80, 59 P.3d 85 (2002). Like the Breathalyzer, the DataMaster analyzed breath samples using the infrared spectroscopy method. *State v. Wittenbarger*, 124 Wn.2d 467, 476, 880 P.2d 517 (1994). Unlike the Breathalyzer, the DataMaster possessed "the technological capability of monitoring its performance at each breath test." *Id*. at 482-83. This capability meant that the DataMaster was "self-certifying." *City of Seattle v. Ludvigsen*, 162 Wn.2d 660, 678, 174 P.3d 43 (2007) (Madsen, J., concurring) (citing *Wittenbarger*, 124 Wn.2d at 483).

The DataMaster tested itself for accuracy by "perform[ing] a control test of a simulator solution each time a breath test is administered." *Wittenbarger*, 124 Wn.2d at 483. As former WAC 448-12-210 (1985), *repealed by* Wash. St. Reg. 91-06-022 (Mar. 29, 1991), provided, "The simulator test will ensure the correct operation and calibration of the instrument and thus will certify the instrument with each test." The instrument then printed the results of the simulator test along with the BrAC test results on a breath test ticket. *Wittenbarger*, 124 Wn.2d at 483. Thus, the breath test ticket was "a crucial document in determining whether the [instrument] was operating properly during a particular test" because it showed that when given a control sample containing a known quantity of alcohol, the machine accurately measured and reported that known quantity. *Id.* We upheld the approval of the DataMaster and its operating protocols in *State v. Ford*, 110 Wn.2d 827, 755 P.2d 806 (1988), and *State v. Straka*, 116 Wn.2d 859, 810 P.2d 888 (1991). *See Allison*, 148 Wn.2d at 80.

In 1985, the state toxicologist added a requirement to the regulations: the results of each breath sample measurement must fall "within plus or minus ten percent of the average of the two measurements." Former WAC 448-12-220 (1986), *repealed by* Wash. St. Reg. 91-06-022 (Mar. 29, 1991). As discussed further below, this requirement is designed to ensure that the machine tests deep alveolar air, not mouth breath.

In 2004, the legislature codified the foundational breath test admissibility requirements in RCW 46.61.506. The legislature stated that it intended to "reduce the delays caused by challenges to various breath test instrument components and maintenance procedures." LAWS OF 2004, ch. 68, § 1. According to this legislation, such challenges, while still allowed, no longer go to admissibility of test results but, rather, to their weight. *Id.*; *see* RCW 46.61.506(4)(c). The state toxicologist responded to the statutory changes by repealing the prior breath testing regulations and promulgating a new set of breath testing regulations in chapter 448-16 WAC. CP at 51 (FF 5.12 (citing *Ludvigsen*, 162 Wn.2d at 677-78 (Madsen, J., concurring))).

The foundational admissibility requirements in RCW 46.61.506 incorporate aspects of the *Baker* factors and the state toxicologist's regulations. Relevant here, under this law, BrAC test results are admissible at trial only if the State "produces prima facie evidence" that the breath samples taken by the testing instrument "agree to within plus or minus ten percent of their mean to be determined by the method approved by the state toxicologist." RCW 46.61.506(4)(a)(vi). As mentioned above, there is an important reason for this requirement: there is a scientific consensus that if individual breath test results derived from the breath samples fall outside 10 percent of the mean of all contemporaneous test results, then at least one of those breath samples came from mouth air where alcohol

content does not correspond to intoxication. CP at 48 (FF 5.3 (quoting

WASHINGTON STATE PATROL (WSP) BREATH TEST PROGRAM TRAINING MANUAL

(Nov. 2014) Ex. 4A))). Thus, RCW 46.61.506(4)(a)(vi)'s requirement (to calculate

the mean and then calculate whether any individual test result was a real outlier

from the mean) confirms that the samples provided to the machine were samples of

deep lung air, which is the substance actually sought to be tested.

In 2007, the WSP Breath Test Program (BTP) began the process of seeking

bids for a new breath test instrument to replace the DataMaster. CP at 40 (FF 3.3).

The state toxicologist, Dr. Fiona Couper,[4] worked with the WSP BTP to create a

bid specification document. *Id*. (FF 3.4, 3.5). The final version of that document

shows that WSP sought an instrument capable of computing whether each

individual breath test result fell within plus or minus 10 percent of the mean of all

contemporaneous breath test results. Ex. 1. The specification document provided a

formula for that calculation; it required the mean to be *truncated* to 4 decimal

places before multiplying by .9 and 1.1 to obtain the plus or minus 10 percent

range. *Id.* at 5.  The company that produces the Dräger Alcotest 9510 was the only

---

[4] Dr. Couper was hired as state toxicologist in 2008 and served in that role at all times relevant to this case. CP at 39 (FF 2.11). She is responsible for approving "satisfactory techniques or methods" for analyzing blood and BrAC. RCW 46.61.506(3); WAC 448-16-010.

one that submitted a bid, and its bid complied with this truncation specification.

Ex. 2; CP at 41 (FF 3.6). Following negotiations, the bid was accepted. Ex. 2.

In 2010, Dr. Couper approved of the Dräger Alcotest 9510 as a breath test instrument in WAC 448-16-020(1)(c). The Dräger, like the DataMaster, is a self-certifying breath test instrument. It follows the same protocol as the DataMaster for self-testing to ensure the accuracy of its BrAC measurements. WAC 448-16-050 (10-step protocol requiring blank tests and known-quantity sample tests to be conducted in between tests of subject's breath samples). In addition to conducting an infrared test on the two breath samples, the Dräger also performs an electrochemical cell test.[5] Thus, two breath samples analyzed by the Dräger will yield four individual breath test results.

When the state toxicologist approved the Dräger as a breath test instrument, she also updated former WAC 448-16-060 to reflect the new instrument's approval. That updated regulation, however, provided the following as the approved method for "for determining whether two breath samples agree to within plus or minus ten percent of their mean":

> (1) The breath test results will be reported, truncated to three decimal places.

---

[5] *See* 32 LINDA M. CALLAHAN, WASHINGTON PRACTICE: WASHINGTON DUI PRACTICE MANUAL § 25B:1 at 1064 (2022-2023 ed.) (describing the two test procedures).

(2) For the DataMaster instruments, the mean of the two breath test results will be calculated and rounded to four decimal places. <u>For the Dräger instrument, the mean of all four results will be calculated and **rounded** to four decimal places.</u>

(3) The lower acceptable limit will be determined by multiplying the above mean by 0.9, and truncating to three decimal places.

(4) The upper acceptable limit will be determined by multiplying the mean by 1.1 and truncating to three decimal places.

(5) If the individual results fall within and inclusive of the upper and lower acceptable limits, the two breath samples are valid.

Former WAC 448-16-060 (emphasis added).

As this quoted and emphasized language shows, despite the fact that the 2008 bid specification document called for a machine that *truncated* the mean to four decimal places, the regulation mandates that the mean will be *rounded* to four decimal places.[6] The Dräger followed the specs, not the governing legal regulation: the district court found, and the parties now agree, that the Dräger has always been programmed to truncate the mean and has never followed the rounding formula required by the applicable law, that is, by former WAC 448-16-060(2). CP at 57 (FF 5.34).

---

[6] The district court found, and the parties agree, that "truncation" and "rounding" are "terms of art in the scientific community in the context of alcohol breath testing machines." CP at 56 (FF 5.31 & n.119). Rounding to four decimal places requires adjusting the fourth decimal up or down depending on the value of the fifth decimal place. Truncating to four decimal places requires cutting off the mean at four decimal places "without regard to the value of any number" in the fifth decimal place. *Id.* (quoting *Commonwealth v. Hourican*, 85 Mass. App. Ct. 408, 412, 10 N.E.3d 646 (2014)).

II.     Dr. Couper's 2015 declaration

Nevertheless, in 2015, Dr. Couper signed a declaration under penalty of

perjury stating, "All approved breath test instruments calculate whether the breath

test results are within plus or minus 10% of their mean in accord with WAC 448-

16-060. If a breath sample is outside this parameter, no breath test result is

generated." CP at 53-54 (underlining omitted) (FF 5.20 (quoting Ex. 11)). This

declaration was admitted as an exhibit in thousands of Department of Licensing

(DOL) license suspension and revocation hearings in order to lay the foundation

for admission of breath test results. Ex. 12 (attorney declarations explaining how

Dr. Couper's declaration was used). Dr. Couper's assertions are obviously not true,

as the district court found. *E.g.*, CP at 57 (FF 5.34), 66 (FF 7.17), 100 (Conclusion

of Law (CL) 4.68).

III.    Austin Keller's breath test, arrest, and charges

On the evening of May 9, 2020, Keller drove his vehicle into a ditch in

Bremerton. CP at 35 (FF 1.1). When Kitsap County Sheriff's Deputy Tanner Justin

arrived on the scene, Keller admitted that he drove his car into the ditch. *Id.* (FF

1.2). According to Justin's incident report, Keller "appeared to be okay and was

walking and talking normally with the medics." Ex. 13 (Kitsap County Sheriff's

Office Incident/Investigation Report). Justin asked the medics if they "sense[d] any

sort of impairment," and they stated they did not. *Id.* Justin initially didn't notice

any impairment either, but he smelled "the odor of intoxicants" when he got closer

to Keller. *Id.* At that point, Justin asked Keller to perform field sobriety tests, and

Keller consented. *Id.* On the first test, which measured "horizontal gaze

nystagmus," (HGN)[7] Keller showed six out of six "clues of impairment." *Id.* This

"surprised" Justin "because [Keller] was walking and talking so normally." *Id.* On

the walk and turn test, in contrast, Keller showed only one out of eight clues of

impairment. *Id.* And on the one-leg stand test, he showed zero of four clues. *Id.*

Because Keller showed so few signs of impairment on the second and third test,

Justin began to think that Keller might "just have a natural nystagmus in his eyes."

*Id.* Finally, Keller consented to a portable breath test that showed an alcohol result

of 0.132 g/100 mL of breath. *Id.* At that point, Justin arrested him and took him to

the central office in Silverdale for a BrAC test. *Id.*

At the central office, the deputy completed the required 15-minute

observation period before administering the breath alcohol test. CP at 36 (FF 1.4).

Keller then submitted two breath samples into a Dräger Alcotest 9510 machine. *Id.*

---

[7] "Nystagmus is the involuntary oscillation of the eyeballs, which results from the body's attempt to maintain orientation and balance. HGN is the inability of the eyes to maintain visual fixation as they turn from side to side or move from center focus to the point of maximum deviation at the side." *State v. Baity*, 140 Wn.2d 1, 7 n.3, 991 P.2d 1151 (2000). HGN tests are conducted by observing the suspect's eyeballs for movement. *State v. Quaale*, 182 Wn.2d 191, 198, 340 P.3d 213 (2014).

The Dräger produced a printout reporting results of 0.117 and 0.116 on the first sample, and 0.117 and 0.116 on the second sample. *Id.*; Ex. 14. It is illegal to drive with a blood or breath alcohol concentration of 0.08 or higher, or while "under the influence of or affected by intoxicating liquor." RCW 46.61.502(1)(a), (c). On January 22, 2021, the State charged Keller with one count of DUI in violation of RCW 46.61.502(1).[8] CP at 1. Keller pleaded not guilty.

IV.     WSP "potential impeachment disclosure" letter

On June 16, 2021, WSP sent a letter to the Washington Association of Prosecuting Attorneys, copying Dr. Couper, with the subject line "Potential Impeachment Disclosure Concerning Evidential Breath Test Results." CP at 58 (FF 6.1); Ex. 15. The letter stated that on June 3, 2021, WSP "'was <u>notified</u> that the

---

[8] RCW 46.61.502 provides:

(1) A person is guilty of driving while under the influence of intoxicating liquor, cannabis, or any drug if the person drives a vehicle within this state:

(a) And the person has, within two hours after driving, an alcohol concentration of 0.08 or higher as shown by analysis of the person's breath or blood made under RCW 46.61.506; or

(b) The person has, within two hours after driving, a THC concentration of 5.00 or higher as shown by analysis of the person's blood made under RCW 46.61.506/ or

(c) While the person is under the influence of or affected by intoxicating liquor, cannabis, or any drug; or

(d) While the person is under the combined influence of or affected by intoxicating liquor, cannabis, and any drug.

The State charged Keller under all four sections.  CP at 1-2.

13

process used by the Dr[ä]ger Alcotest 9510 to determine agreement of duplicate breath samples is <u>potentially not calculated</u> in accordance with the Washington Administrative Code (WAC 448-16-060).'" CP at 58 (FF 6.2 (quoting Ex. 15)). Specifically, the letter noted that while former WAC 448-16-060 states that the mean of the four breath test results will be rounded to four decimal places, "'[i]<u>nitial investigation</u> indicates the Dr[ä]ger Alcotest performs this mean calculation and <u>truncates</u> to four decimal places.'" *Id.* at 59 (FF 6.9 (quoting Ex. 15)). The letter also stated that after reviewing 81,000 breath tests, WSP found no instance of a test that was accepted by the machine using a truncated mean that would not have been accepted had the mean been rounded. Ex. 15.

On June 18, 2021, Dr. Couper signed another declaration under penalty of perjury. This one acknowledged that the Dräger machine does not follow the rounding method required by former WAC 448-16-060. Ex. 3 (decl. of Fiona Couper (June 18, 2021)).

V.     Keller moves to suppress BrAC test results based on WSP letter

On December 16, 2021, Keller moved to suppress his Dräger BrAC test results. CP at 127. Citing the WSP letter, Keller argued that the Dräger instrument did not follow the rounding method required by former WAC 448-16-060. CP at 129. Keller contended that former WAC 448-16-060 required the Dräger instrument itself to compute whether the results fell within plus or minus 10

percent of their rounded mean and that "strict compliance" with that requirement was necessary for breath test results to be admissible. CP at 127-30. Keller did not argue that his test results were inaccurate—he argued only that the instrument did not follow former WAC 448-16-060 when it calculated whether those results fell within plus or minus 10 percent of their mean. CP at 130.

The State opposed. It argued that even though the Dräger truncated the mean at the fourth decimal place rather than rounding it, that caused Keller no prejudice because the mean of Keller's four breath samples is still 0.1165, even without truncation.[9] CP at 148. Since the mean is only four decimal places long, there is no nonzero fifth digit to truncate or round. In other words, Keller's results would be valid (would fall within plus or minus 10 percent of their mean) regardless of whether the truncation or rounding method were followed. *Id*. The State therefore concluded that the breath samples were still valid under RCW 46.61.506(3). CP at 147.

The State also argued that nothing in RCW 46.61.506(4) or former WAC 448-16-060(2) specifies "*when* the State must prove" the two breath samples agree to within plus or minus 10 percent of their mean. CP at 148 (emphasis added). Thus, the fact that "the initial mathematical determination was done differently

---

[9] The mean is derived from adding the four breath test results together and dividing by four. Here, $(0.116 + 0.116 + 0.117 + 0.117) / 4 = 0.1165$.

than [former WAC] 448-16-060(2) mandates does not prevent the State from

redoing this math at trial in a manner compliant" with that regulation. CP at 148-

49.

> VI.    Dr. Couper approves of the truncation method after the fact in a
> signed declaration, not a regulation

On January 20, 2022, Dr. Couper signed another declaration under penalty

of perjury entitled "Instruments, Equipment and External Standards Approved for

the Quantitative Measurement of Alcohol in Person's Breath in Washington State."

Ex. 18. This declaration states in part:

> The Dr[ä]ger Alcotest 9510 calculates whether the breath test results
> are within plus or minus 10% of their mean (inclusive) using the
> following formula – the sum of the four breath test results divided by
> four (4) to obtain the mean result, which is <u>truncated</u> to four decimal
> places. To calculate the acceptability range (+/- ten percent of mean),
> the mean is then multiplied by 0.9 and 1.1, truncated to three decimal
> places – <u>this method is approved</u>. If a breath sample is outside this
> parameter, no breath test result is generated.

*Id.*; CP at 66 (FF 7.19). This declaration makes no mention of former WAC 448-

16-060, which was still on the books and which still required rounding.

> VII.   Kitsap County District Court grants Keller's motion to suppress

On March 8, 2022, the Kitsap County District Court sat en banc to consider

Keller's motion to suppress. On June 13, 2022, the district court issued an 89-page

order granting the motion. CP at 28-116.

Critically, that court interpreted former WAC 448-16-060 as requiring the Dräger instrument itself to calculate the mean of the four breath test results and to determine whether those results fell within plus or minus 10 percent of their rounded mean for those results to be valid and admissible. CP at 60 (FF 6.17), 79 (CL 3.40), 81 (CL 3.56), 84 (CL 3.66). This premise served as the foundation for all of the trial court's rulings on the suppression motion.

Based on that premise, the district court held that Dräger-generated breath test printouts are not "valid" under RCW 46.61.506(3) and are not admissible under RCW 46.61.506(4)(a)(vi). CP at 84 (CL 3.68, 3.69). Both of those statutes state that the mean and the acceptable range must be calculated according to the method approved by the state toxicologist. Dr. Couper approved the truncation method in her 2022 declaration. CP at 66 (FF 7.19, 7.20). But she did not repeal the WAC that required the rounding method, that is, former WAC 448-16-060. CP at 67 (FF 7.22). The court ruled that the 2022 declaration could not override the rounding method published in the WAC and thus the truncation method was not an "approved method[]" under RCW 46.61.506(3). *See id.* Because the district court held that the approved method required the Dräger machine to calculate the mean according to the rounding method in former WAC 448-16-060, it concluded that the State could not meet the statutory admissibility requirement for a valid test. CP

17

at 81 (CL 3.56), 84 (CL 3.68). That court ruled the test results were inadmissible under *Baker* for the same reason. CP at 84 (CL 3.70).

The district court also rejected the State's offer of proof to lay the foundation for admissibility of the breath test results under RCW 46.61.506(4)(a)(vi) by calling an expert witness at trial. The State proposed calling such an expert at trial to do the math to calculate the mean, in accordance with former WAC 448-16-060(2)'s rounding method, to prove that the four breath test results fell within the required plus or minus 10 percent of that rounded mean. The district court rejected that offer of proof; it held that the Dräger machine itself must conduct the former WAC 448-16-060 calculation at the time of the test in order for the breath test printout or any of the data contained in the printout to be admissible. *Id.*

Finally, that court ruled that even if the breath test results were admissible under RCW 46.61.506 and *Baker*, they were still inadmissible under ER 702, 401, 402, and 403. CP at 32, 112 (CL 4.131). These rulings were all based on the same premise: for the breath test result printout to be admissible, "the State's expert witness *must* offer opinion testimony that the plus or minus 10 percent of the mean calculation was conducted by the self-certifying Dräger machine in accordance with the method approved by the state toxicologist in [former] WAC 448-16-060 as required by RCW 46.61.506." CP at 98 (emphasis added) (CL 4.59). Since a witness could not truthfully testify that the machine itself conducted that former

18

WAC-448-16-060-required calculation, the witness's testimony would necessarily

be "false and misleading" and, hence, inadmissible. CP at 99 (CL 4.60, 4.63).

In sum, the district court ruled that the breath test results were inadmissible

in Keller's case and in all Kitsap County District Court cases because the State "is

unable to produce prima facie evidence the printout can be generated in

compliance with RCW 46.61.506(3), RCW 46.61.506(4)(a), the methods approved

by the state toxicologist pursuant to RCW 46.61.506, and *State v. Baker.*" CP at 84

(CL 3.70).[10] It therefore granted Keller's motion to suppress "breath test printouts

generated by a Dräger breath test machine." *Id.* (footnote omitted) (CL 3.71).

> VIII.  The district court rules that the practical effect of suppressing the
> evidence is to terminate the case

The State sought to appeal that order under RALJ 2.2. That rule allows the

State to appeal "[a] pretrial order suppressing evidence, if the trial court expressly

finds that the practical effect of the order is to terminate the case." RALJ 2.2(c)(2).

So on July 23, 2022, the State filed a "Motion for Finding Practical Effect of

Suppression of Evidence Is To Terminate the Case and Certificate in Support

Thereof." CP at 120. Keller opposed. The district court granted the State's motion,

---

[10] The district court also ruled that Keller had standing to challenge the breath test results, CP at 70 (CL 2.7), and that Keller failed to meet his burden to show that the State toxicologist's approval of the Dräger machine was arbitrary and capricious, CP at 116 (CL 5.13). Neither party assigned error to these conclusions of law, and they are not before us now.

ruling that the State had insufficient evidence to proceed against Keller without the BrAC results and that the practical effect of the suppression order was to terminate the case. *Id.* at 134. The court also entered an order finding that the requirements of RAP 4.3(a)(2), pertaining to direct review of decisions of courts of limited jurisdiction, were met. *Id.* at 136-37.

IX.    State seeks direct review in this court

On August 8, 2022, the State sought direct review in this court by way of a notice of appeal. CP at 140. Keller opposed and filed a cross appeal. Notice of Cross Appeal, *State v. Keller*, No. 101171-7 (Wash. Aug. 8, 2022). Finding that the case met the requirements of RALJ 2.2 and RAP 4.3(a)(2), our commissioner granted direct review. Ruling Granting Direct Rev. of RALJ Decision, *State v. Keller*, No. 101171-7 (Wash. Aug. 25, 2022).  In its opening brief, the State raised three issues: (1) whether the district court erred in concluding that the statute and WAC required the Dräger instrument itself to perform the WAC 448-16-060 calculation, (2) whether the district court erred in barring the State from presenting evidence that would establish the foundational requirements for admission of the breath test, and (3) whether the state toxicologist's 2022 amendment of the WAC to authorize truncation of the mean applies retroactively to Keller's case. Keller raised one counterissue: whether the district court erred by concluding that the practical effect of the suppression order was to terminate the case under RALJ 2.2.

The DOL filed an amicus brief in support of the State.[11] Washington

Association of Criminal Defense Lawyers (WACDL) and Washington Foundation

for Criminal Justice filed a joint amici brief supporting Keller.[12]

---

[11] DOL mainly argues that affirmance of the district court's rulings would hamper DOL's ability to conduct administrative license suspension hearings based on DUI. Unlike criminal cases where the State can prosecute a defendant for DUI without breath test results, the State cannot proceed in a license suspension hearing without breath test results. Br. of Amicus Curiae of the DOL at 7-8 (citing RCW 46.20.308(7) (requiring hearing examiner to determine whether the test results show the alcohol concentration of the person's breath was over 0.08)). DOL attached a declaration and a sampling of DOL license suspension hearing written decisions to its brief to support its point. *Id.* (Attach. 4). Keller moved to strike these portions of DOL's brief on the basis that DOL is impermissibly attempting to develop new facts on appeal by supplementing the record. We passed the motion to strike to the merits, and we now deny it. We disagree that DOL attempted to develop new facts on appeal—instead it references documents that are available to the public along with a declaration that explains what those documents are. However, we decline to consider DOL's arguments about civil license suspension hearings because that issue is not before us in Keller's criminal case.

[12] WACDL filed a motion to allow additional appendices that it asserted were necessary to provide the full record of attachments to DOL's brief. The first proposed appendix was the superior court decision on appeal of one of the license suspension cases DOL had attached to its amicus brief. The second proposed appendix was an unredacted amended final order in a different DOL license suspension hearing. DOL had attached the redacted version of this same order to its amicus brief. We passed the motion to the merits. Following oral argument, DOL submitted an answer to WACDL's motion. We now grant WACDL's motion to supplement the record with these publicly available court documents. However, as stated *supra* note 11, we decline to consider the issue of civil license suspension hearings because that issue is not before us in this case.

ANALYSIS

I.     The district court did not abuse its discretion in concluding that the practical effect of the suppression order was to terminate the case

We must first consider whether the district court abused its discretion by concluding that the practical effect of suppressing Keller's BrAC results was to terminate the case.

As mentioned above, RALJ 2.2(c)(2) authorizes the State to appeal a "pretrial order suppressing evidence, if the trial court expressly finds that the practical effect of the order is to terminate the case." *See also* RAP 2.2(b)(2) (corollary superior court rule). The district court expressly ruled that "the State cannot move forward on this matter due to insufficient evidence [Keller] was 'affected by' intoxicating liquor or drugs while operating a motor vehicle, and thus the practical effect of the order entered on June 13, 2022, suppressing the Dr[ä]ger B[r]AC results, is to terminate the case." CP at 134 (order). Based on that ruling, the State sought direct review of the suppression order in this court.  CP at 140.

Keller appeals the district court's RALJ 2.2(c)(2) order. He acknowledges that without the BrAC test results, the State can no longer proceed under the "per se" prong of the DUI statute, RCW 46.61.502(1)(a). But Keller argues that the State can still proceed under RCW 46.61.502(1)(c) by showing that he was "under the influence of or affected by intoxicating liquor." He urges us to apply a de novo standard of review to "determine, reviewing the non-suppressed evidence in the

light most favorable to the State," whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Br. of Resp't in Surreply at 7. He argues that the sheriff deputy's prearrest observations of Keller support a verdict of DUI beyond a reasonable doubt. *Id.* at 8.

The State argues that the district court's order that the practical effect of the suppression order was to terminate the case is not appealable, but that even if it is, we review that order for abuse of discretion. The State concludes that the district court committed no such abuse of discretion.[13]

We have no case law directly addressing the standard by which we review an RALJ 2.2(c)(2) order. The State argues that an analogous situation arises when a party seeks to appeal from a final judgment that does not dispose of all the claims or counts as to all the parties. Reply Br. of Appellant & Br. of Cross-Resp't at 9. In such a case, RAP 2.2(d) specifies that an appeal may be taken only "after an express direction by the trial court for entry of judgment and an express determination in the judgment, supported by written findings, that there is no just reason for delay." CR 54(b) contains nearly identical language. In such cases, appellate courts review the trial court's findings for abuse of discretion. Reply Br.

---

[13] The State also argues that Keller did not move to modify the commissioner's ruling on this issue so that ruling is final. The State overlooks the fact that Keller specifically cross appealed on this issue, that this court accepted review of the appeal and cross appeal, and that Keller explicitly assigns error to this trial court ruling.

of Appellant & Br. of Cross-Resp't at 9 (citing *Nelbro Packing Co. v. Baypack Fisheries, LLC*, 101 Wn. App. 517, 524-25, 6 P.3d 22 (2000)); *see also Foster v. Bellingham Urology Specialists, PLLC*, No. 82349-3-I, slip op. at 13 & n.12 (Wash. Ct. App. Mar. 27, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/823493.pdf. The trial court does not abuse its discretion if there is a basis in the record supporting its decision. Reply Br. of Appellant & Br. of Cross-Resp't at 9 (citing *Fox v. Sunmaster Prods., Inc.*, 115 Wn.2d 498, 503, 798 P.2d 808 (1990)).

As a matter of first impression, we hold that a trial court's RALJ 2.2(c)(2) order is appealable and that we review such orders for abuse of discretion. To be sure, a trial court's "express[] find[ing] that the practical effect" of a suppression order is to terminate a case is partly a factual decision and partly a legal decision because it considers the proffered facts in light of the elements of the crime charged. We review many such mixed questions of fact and law (such as the existence of probable cause or reasonable suspicion) de novo.  But not all of them. For example, we review most evidentiary errors for abuse of discretion. *E.g.*, *Peralta v. State*, 187 Wn.2d 888, 894, 389 P.3d 596 (2017).

To decide which standard of review best fits a RALJ 2.2(c)(2) order, we examine (1) whether factual or legal issues predominate and (2) whether the trial

court judge or the reviewing court judges are better situated to evaluate the potential impact on the fact finder of the proffered facts.

As the record in this case shows, factual matters predominate and the experienced trial judge is in the better position to evaluate the impact that those proffered facts might have on the fact finder. In the hearing on the State's motion for an RALJ 2.2(c)(2) order, each party described the evidence it expected to offer into evidence at Keller's trial. Verbatim Rep. of Proc. (VRP) (July 25, 2022) at 4-11. As detailed above, this evidence showed that Keller did not appear intoxicated and that he did so well on most of the field sobriety tests that the deputy sheriff thought he might have a natural nystagmus in his eyes. The only evidence of intoxication was that Keller got into a car accident, that he "admitted to drinking" at his girlfriend's birthday party "but didn't think he was doing anything wrong when driving," that his eyes showed signs of nystagmus (which can be a natural state and is not exclusively associated with intoxication), and that he showed one "clue[] of impairment" on the walk and turn field sobriety test and none on the other test. CP at 4-5. The roadside breath test would not have been admissible at trial. *State v. Smith*, 130 Wn.2d 215, 225, 922 P.2d 811 (1996). The judge thoroughly considered these proffers and the parties' arguments about the strengths and weaknesses of that proffered evidence in light of "all the driving under the influence investigations [he had] seen," and concluded that given "how little

25

evidence of impairment there was in this case" apart from the BrAC results, he would "likely grant a motion to dismiss" if the defense made such a motion at the close of evidence. VRP (July 25, 2022) at 12-13.

Those are the kinds of experience-based observations that a trial judge is in the best position to make. The district court did not abuse its discretion in granting the State's motion for an RALJ 2.2(c)(2) order. The State's appeal is properly before this court.

II. The district court erred in concluding that the Dräger breath test results were invalid and inadmissible under RCW 46.61.506 and *Baker*

The district court ruled that the breath test results were invalid under RCW 46.61.506(3) and inadmissible under RCW 46.61.506(4)(a)(vi) because the Dräger machine did not comply with the state-toxicologist-approved methods for analysis of breath alcohol. The district court based this ruling on its conclusion that the applicable statutes and regulations require the Dräger machine itself to compute, at the time of the test, whether the breath test results fall within plus or minus 10 percent of their mean following the formula in former WAC 448-16-060—and the Dräger machine was simply not programmed to do that. All of the district court's evidentiary rulings rely on this premise.

But, as the State contends, the applicable statutes and regulations do not require the Dräger machine to perform that calculation itself at the time of the test.

In fact, the district court here did not really find that supposed requirement in any statute or regulation. Instead, the district court found that supposed requirement in certain other documents. We disagree with the district court's conclusion that those other documents require the Dräger machine itself to compute the math at issue here at the time it takes the breath samples.

We begin with the plain language of the relevant statutes and regulations and then turn to the trial court's and defendant's remaining arguments.

>    A.  The plain language of the relevant statutes and regulations does not require the Dräger instrument to perform the calculation itself at the time of the test

We review the district court's findings of fact for substantial evidence. *In re Est. of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). We review its conclusions of law and statutory interpretation de novo. *Id.*

This case involves interpretation of both statutes and administrative regulations. The same rules of statutory construction "'"'apply to administrative rules and regulations, particularly where . . . they are adopted pursuant to express legislative authority.'"'" *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 56, 50 P.3d 627 (2002) (alteration in original) (quoting *City of Kent v. Beigh*, 145 Wn.2d 33, 45, 32 P.3d 258 (2001) (quoting *State v. Burke*, 92 Wn.2d 474, 478, 598 P.2d 395 (1979))). In statutory interpretation, our "fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face,

then the court must give effect to that plain meaning as an expression of legislative intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002) (citing *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). We determine plain meaning by "considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole." *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.,* 182 Wn.2d 342, 350, 340 P.3d 849 (2015) (citing *Campbell & Gwinn*, 146 Wn.2d at 9-10).

We begin with the statute. As discussed, in 2004 the legislature codified the foundational requirements for admissibility of blood and breath tests in RCW 46.61.506. Relevant here, RCW 46.61.506(3) states that "[a]nalysis of the person's blood or breath to be considered valid under the provisions of this section . . . shall have been performed according to methods approved by the state toxicologist." This does not require the Dräger machine itself to do the math at the time it takes the breath samples.

Next, RCW 46.61.506(4) lists eight foundational requirements required to admit a breath test. Relevant here, the statute provides:

> (4)(a) A breath test performed by any instrument approved by the state toxicologist shall be admissible at trial or in an administrative proceeding if the prosecution or department produces prima facie evidence of the following:
>
>   . . . .

(vi) The two breath samples agree to within plus or minus ten percent of their mean to be determined by the method approved by the state toxicologist.

These quotes show that these two statutes require breath tests to comply with state-toxicologist-approved methods to be admissible. These quotes also show that these two statutes do not require the Dräger machine itself do the math at the time it takes the breath samples.

Next, we turn to the regulations. WAC 448-16-050 provides a definition of a breath test and a 10-step protocol that the breath test instrument must follow. It states:

A test of a person's breath for alcohol concentration will consist of the person exhaling end-expiratory air samples at least twice into the instrument, sufficient to allow two separate measurements. There will be sufficient time between the provision of each sample to permit the instrument to measure each sample individually. Two valid breath samples,[14] provided consecutively, will constitute one test.

The instrument will perform this test according to the following protocol when being employed to quantitatively measure an individual's breath alcohol concentration. Successful compliance with each step of this protocol is determined from an inspection of the printout of results. These steps are necessary to ensure accuracy, precision, and confidence in each test.

Step 1. Data entry.

Step 2. Blank test with a result of .000.

Step 3. Internal standard verified.

Step 4. First breath sample provided by subject.

---

[14] WAC 448-16-030(12) defines "valid breath sample" as "a sample of a person's breath provided in such a manner to be accepted for analysis by the instrument."

Step 5. Blank test with a result of .000.

Step 6. External standard test. The result of this test must be between .072 and .088, inclusive.

Step 7. Blank test with a result of .000.

Step 8. Second breath sample provided by subject.

Step 9. Blank test with a result of .000.

Step 10. Printout of results.

WAC 448-16-050.

This protocol requires the instrument to conduct an external standard test with specific required results. In this way, the instrument is able to self-test the accuracy of its measurements.[15]

Notably, there is no mention of the plus or minus 10 percent of the mean calculation in this self-testing protocol, which is "necessary to ensure accuracy, precision, and confidence in each test." *Id.* In other words, this WAC does not require the Dräger machine itself to do the math at the time it takes the breath samples.

The state-toxicologist-approved method "for determining whether two breath samples agree to within plus or minus 10 percent of their mean" is

---

[15] "External standard test" means "the process by which the accuracy of the instrument is verified, using a simulator containing a certified simulator solution or a compressed gas standard containing a known alcohol concentration." WAC 448-16-030(8). "Accuracy" means "the proximity of a measured value to a reference value." WAC 448-16-030(1). Thus, performing the external standard test is the method by which the Dräger self-tests for accuracy. *See Wittenbarger*, 124 Wn.2d at 483.

contained in a separate regulation, WAC 448-16-060. Former WAC 448-16-060—

which was in effect at the time of Keller's arrest—provided:

> Pursuant to RCW 46.61.506 the following method is approved for determining whether two breath samples agree to within plus or minus 10 percent of their mean.
>
> (1) The breath test results will be reported, truncated to three decimal places.
>
> (2) For the DataMaster instruments, the mean of the two breath test results will be calculated and rounded to four decimal places. *For the Drager instrument, the mean of all four results will be calculated and rounded to four decimal places.*
>
> (3) The lower acceptable limit will be determined by multiplying the above mean by 0.9, and truncating to three decimal places.
>
> (4) The upper acceptable limit will be determined by multiplying the mean by 1.1 and truncating to three decimal places.
>
> (5) If the individual results fall within and inclusive of the upper and lower acceptable limits, the two breath samples are valid.

(Emphasis added.)

This rule is written in passive voice. That means that it provides a formula

for calculating the mean and determining the acceptable range, but it does not

specify that the Dräger machine itself must do the math at the time it takes the

breath samples.

The rule is also written in future tense—it states that the mean "will be"

calculated, but it does not specify at what point in time that calculation must occur.

And, comparing the language of this regulation to that of WAC 448-16-050, it is

clear that the drafters of the regulations knew how to specify when the instrument

31

is required to do something: WAC 448-15-050 states, "The instrument will perform this test…" but former WAC 448-16-060 does not.

Thus, the State is correct—the plain language of the relevant statutes and regulations does not require the Dräger machine to perform the "round[ing]," mean, or distance-from-the-mean calculations that former WAC 448-16-060 mandates.

### B. No other source of law requires the Dräger instrument to perform the calculation at the time of the test

As discussed above, the district court came to a different conclusion: it determined that there *is* a requirement that the Dräger instrument conduct the former WAC 448-16-060 calculation at the time of the test and that such a requirement is part of the "methods approved by the state toxicologist" without which a test is invalid and inadmissible. *See, e.g.*, CP at 77 (CL 3.33 (describing Dräger machine's compliance with former WAC 448-16-060 method as a "state toxicologist approved method[]")), 57 (FF 5.39 (describing requirement that the Dräger software must display a "Samples Outside 10%" message and abort the test when in noncompliance with former WAC 448-16-060 as a "state toxicologist approved method")). Nearly all of the district court's rulings depend on this conclusion.

But as also discussed above, no statute or regulation requires the Dräger machine itself to perform those calculations. The district court cited certain other documents as a source of that requirement. Those documents are the *2008 Evidentiary Breath Test Instrumentation Specifications* (Ex. 1), the DOL Fiona Couper declaration of May 2015 (Ex. 11), two versions of the *WSP Breath Test Program Technical Manual* from November 2018 (Ex. 4A) and March 2020 (Ex. 5), and the Fiona Couper declaration from January 2022 (Ex.18).

To be sure, our case law does hold that the state toxicologist can establish an "approved method" under RCW 46.61.506(3) without codifying it in a WAC. *Straka*, 116 Wn.2d at 876 (citing former RCW 46.61.506(3) (1987)).[16]

But our case law also places a strict limit on that informal manner of establishing an "approved method": an unpublished method or protocol is not effective if it contradicts a published regulation to the contrary. *Id*. at 870. In *Straka*, for example, we held that written protocols that the state toxicologist's office followed in order to mix the simulator solution and certify DataMaster machines were "approved methods" under RCW 46.61.506 even though they were not published in the WAC. *Id*. Those written protocols did not conflict with the statute or regulations and were available to defendants through discovery. *Id*.

---

[16] The version of RCW 46.61.506(3) discussed in *Straka* is identical in relevant respects to the version in place today.

Here, however, the documents the district court cited as establishing additional "approved methods" beyond the text of the WAC conflict directly with the published WAC—they *contradict* that WAC. In addition, the mixture of contradictory and false statements in these documents in this case are nothing like the *Straka* protocols we considered to be "approved methods." Critically, even if the WSP manuals or Dr. Couper's 2022 declaration represents an "approval" of the truncation method, the truncation method conflicts directly with the rounding method. Under *Straka*, a protocol or method not published in the WAC cannot supersede a published regulation. *Id.*

The remaining documents on which the district court relied do not amount to "approvals" of anything at all. The bid specifications are a "wish list" of qualities that WSP and Dr. Couper wanted "in a perfect instrument"—not a description of what the Dräger machine did. Ex. 2 (interview with Dr. Couper). And Dr. Couper's 2015 declaration is a false statement about how the machine worked that was created for use in litigation—DOL hearings—not as an internal protocol. Taken together, these documents do not indicate that the state toxicologist has "approved methods" related to the plus or minus 10 percent calculation apart from the WAC.

We therefore conclude that the district court record lacks substantial evidence that the state toxicologist effectively approved any relevant method that differed

from the plain language of the WAC. And as discussed in Section A above, that WAC did not require the Dräger machine itself to do the math at issue here.

### C. Keller's breath test results are "valid" under RCW 46.61.506(3)

As we have explained, the district court reasoned that WAC 448-15-050 requires the Dräger to compute the plus or minus 10 percent calculation required by former WAC 448-16-060 itself, prior to printing out the breath test results. *E.g.*, CP at 75 (CL 3.24), 98 (CL 4.56). This reasoning also led that court to conclude that Keller's printout was invalid under RCW 46.61.506(3). CP at 76 (CL 3.29).

We disagree. RCW 46.61.506(3) requires that "[a]nalysis" of breath must be performed according to toxicologist-approved methods. "Importantly, the 'relevant procedures' for determining whether a breath test was performed ""according to methods approved by the state toxicologist"'" are those pertaining to the actual administration of the test." *Ludvigsen*, 162 Wn.2d at 678-79 (Madsen, J., concurring) (quoting *Allison*, 148 Wn.2d at 80 (quoting *Ford*, 110 Wn.2d at 833 (quoting RCW 46.61.506(3)))). Read in context, WAC 448-16-050 addresses the process of administering the breath test. *See* Initial Br. of Appellant at 17. WAC 448-16-050 says that a breath test is "valid" as long as the machine collected a "valid breath sample" as defined in former WAC 448-16-030(12) and as long as the machine followed the 10-step protocol in WAC 448-16-050 at the time of the test.

Here, there is no evidence that Keller's breath samples were not valid under WAC 448-16-030(12), and no evidence that the machine did not follow the 10-step protocol in WAC 448-16-050. It necessarily follows that Keller's breath test was "valid" under RCW 46.61.506(3). Initial Br. of Appellant at 17-18; *see supra* note 13.

In fact, as the quoted portion of WAC 448-16-050 shows, that regulation contains the definition of a breath test and the 10-step self-certification protocol, but it does not contain any reference to former WAC 448-16-060 (concerning rounding, calculating the mean, and calculating distance from the mean). The district court's interpretation of the regulations impermissibly reads in requirements that do not appear in the text.[17] *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003) ("[A] court must not add words where the legislature has chosen not to include them.").

D. Keller's breath test results meet the *Baker* requirements

Similarly, there is no evidence that the Dräger instrument in this case was not "in proper working order at the time of conducting the test" under *Baker*, 56

---

[17] At times the district court also appeared to read into the language of former WAC 448-16-060 itself a requirement that the Dräger round the mean. *See* CP at 98 (CL 4.56 ("WAC 448-16-060 requires the Dräger to round the mean of Keller's breath test results before conducting the plus or minus 10 percent calculations.")). But at other points, the district court relies on outside sources to find the requirement that the machine must perform the calculation. *E.g.*, CP at 77 (CL 3.33).

Wn.2d at 852. Since the regulations do not require the Dräger to compute the calculation in former WAC 448-16-060, the instrument's failure to do so cannot mean that the machine was not in proper working order.

In addition, our case law establishes that the instrument's compliance with the applicable control testing protocol is what ensures the instrument was in proper working order. In *Wittenbarger*, we explained that while regulations specific to Breathalyzer instruments required "periodic evaluation and certification of the Breathalyzer machines," the regulations specific to the DataMaster "did not require a similar certification process for the DataMaster machines, presumably because DataMaster machines possess the ability to perform and record the results of a control test each time a breath test is administered." 124 Wn.2d at 490. Because the DataMaster "performs a control test . . . each time a breath test is administered" and prints the results on the breath test ticket, that ticket "is a crucial document in determining whether the DataMaster was operating properly during a particular test." *Id.* at 483. Just as in *Wittenbarger*, the instrument in Keller's case followed the applicable protocol (currently contained in WAC 448-16-050) and produced a printout showing compliance. Keller's breath test results meet the *Baker* requirements.

> E. If the State can lay the foundation for admission of the breath tests—with admissible evidence showing that the results fall within plus or minus 10 percent of their rounded mean as required by former WAC 448-16-060—then the breath test results are admissible under RCW 46.61.506(4)(a)(vi)

Since there is no textual requirement that the Dräger perform the computation required by former WAC 448-16-060, the State argues it can establish the foundational requirements of RCW 46.61.506(4)(a)(vi) at trial. The State asserts that it would call an expert witness, ask that witness to calculate the mean of Keller's four breath test results following the rounding method in former WAC 448-16-060, and show that the breath test results fall within plus or minus 10 percent of their mean. Initial Br. of Appellant at 24.

We agree. Nothing in the statute or regulations limits the kind of evidence the State can use to comply with RCW 46.61.506(4)(a)(vi)'s requirement that the breath test results fall within plus or minus 10 percent of their mean as determined by the method approved by the state toxicologist. *Id.* at 24-25. In fact, of that statute's other seven admissibility requirements, several can be established only by live testimony, so "there can be no inference that the Dräger must independently provide the basis for each" of these requirements. *Id.* at 24-25, 29; *see also* CP at 95 (CL 4.42). For example, no one contests that the State can present evidence that it has complied with the statutory requirements that the defendant did not eat, drink, smoke, or vomit within 15 minutes of giving the breath samples (RCW

46.61.506(4)(a)(ii)) and had nothing in their mouth (RCW 46.61.506(4)(a)(iii))

during that time by calling the test administrator to testify about those facts. *See* CP

at 95 (CL 4.42 n. 265).

F.  The cases on which Keller relies are inapposite because there is no
    textual requirement that the Dräger compute the WAC 448-16-060
    calculation at the time of the test

Keller argues that this court has always required "strict compliance" with

breath alcohol test admissibility requirements and that we have always deemed

breath test results inadmissible if they do not strictly comply with such

admissibility requirements. Br. of Resp't at 41 (collecting cases).

But Keller's argument for strict compliance with the regulations is based on

his assumption that the regulations actually require the Dräger instrument to

perform the rounding, mean, and distance from the mean calculations at the time of

the test in the first place. As discussed above, the regulations do not require that.

Further, the State emphasizes an important distinction between the "strict

compliance" cases cited by Keller and the issue in this case. Those cases all

involved violations of admissibility requirements that, by their nature, had to be

performed at the time of the test. *E.g.*, *Baker*, 56 Wn.2d at 856-57 (breath test was

inadmissible because the administrator failed to observe the defendant for the

required 15 minutes prior to administering breath test); *City of Seattle v. Clark-*

*Munoz*, 152 Wn.2d 39, 48, 93 P.3d 141 (2004) (breath test inadmissible because

thermometer on breath machine was not properly certified at the time of the test as required by former WAC 448-13-035 (1991), *repealed by* Wash. St. Reg. 04-19-144 (Oct. 23, 2004)); *State v. Ryan*, 43 Wn. App. 488, 717 P.2d 1390 (1986) (breath test inadmissible because State could not show that machine's ampoule maintenance requirements were met at time of test); *State v. Watson*, 51 Wn. App. 947, 756 P.2d 177 (1988) (breath test inadmissible because State could not show that machine had been calibrated at time of test). In these cases, "there was no way for the State to go back in time and recreate the test in a way to comply with the WAC." CP at 484 (Suppl. Mem. of Auths. Opposing Suppression of Breath Results).

By contrast, as discussed, there is no textual requirement that the Dräger compute the former WAC 448-16-060 calculation at the time of the test. In addition, there is no logical reason why the machine would have to compute that number at the time of the test. Indeed, the district court recognized that this calculation used to be done manually after the test. CP at 48 (FF 5.4). Math can be performed—and produce the same results—later. If the undisputedly accurate breath test results fall within plus or minus 10 percent of their rounded mean according to the formula in former WAC 448-16-060, "they will always fall within that range regardless of by whom or when that calculation is done." Initial Br. of Appellant at 21.

We therefore hold that the district court erred in barring the State from introducing testimony to establish the validity and admissibility of the breath test under RCW 46.61.506 in Keller's case. Because the district court's conclusion that the breath test results were inadmissible under *Baker* was based on the same erroneous conclusion, we reverse that ruling as well. Finally, we reverse the district court's ruling that Dräger breath test printouts are "not admissible in Kitsap County District Court cases" for the same reasons. CP at 84 (CL 3.70).

III.    The district court erred in ruling that the breath test results were inadmissible under ERs 702, 401, 402, and 403

The district court ruled that even if the results were admissible under RCW 46.61.506, it would still exclude them under ER 702, 401, 402, and 403. CP at 32, 112 (CL 4.131). Thus, we must address whether the district court abused its discretion in excluding them under these evidence rules. An abuse of discretion occurs "when the trial court 'relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.'" *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019) (quoting *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007)).

Once again, the district court's evidentiary rulings all rely on the premise that a breath test result is valid under RCW 46.61.506(3) only if the Dräger instrument performed the former WAC 448-16-060 calculation at the time of the test. As explained above, the statute and regulations impose no such requirement.

Neither does any other document that the district court cited. Thus, we hold the district court abused its discretion in excluding breath test results under ER 702, 401, 402 and 403 because it relied on an erroneous view of RCW 46.61.506 and former WAC 448-16-050 and -060.

CONCLUSION

We affirm the district court's ruling that the practical effect of suppressing Keller's BrAC results was to terminate the case.

No source of law requires the Dräger instrument itself to perform the calculation required by former WAC 448-16-060. We therefore reverse the district court's ruling that Keller's BrAC results are invalid under RCW 46.61.506(3) and inadmissible under RCW 46.61.506(4)(a)(vi) and *Baker*. We also reverse the district court's ruling barring the State from presenting evidence at trial to establish the foundational requirements for admission of the BrAC results under RCW 46.61.506(3) and (4). For the same reasons, we reverse the district court's rulings that the State's proffered evidence was inadmissible under ER 401, 402, 403 and 702 and that Dräger breath test printouts are categorically inadmissible in Kitsap County District Court.

We remand to the district court for proceedings consistent with this opinion.

Gordon McCloud, J.

WE CONCUR:

González, C.J.

Stephens, J.

Yu, J.

Madsen, J.

Montoya-Lewis, J.

Owens, J.

*State v. Keller*, No. 101171-7
Whitener, J., dissenting

No. 101171-7


WHITENER, J. (dissenting) — Located in practically every police precinct in Washington is an evidentiary breath test machine. It is the foundation of modern driving under the influence (DUI) of alcohol prosecutions. Today's precincts employ the Dräger Alcotest 9510. In a list that includes the Breathalyzer and the DataMaster, the Alcotest 9510 is the most technically sophisticated breath test machine Washington has ever employed. A machine, the Alcotest 9510, appears as a neutral, reliable, accurate arbiter of truth. This machine's appearance and increasing technological sophistication can seduce juries, judges, and legislators into a trusting lull when it comes to its test results. Along with proof of driving, the results from an Alcotest 9510's breath analysis can result in a conviction. RCW 46.61.502(1)(a). Mandatory imprisonment; loss of employment; thousands of dollars in fines, fees, monitoring devices, and court ordered programming; loss of one's ability to drive for years; deportation; and inadmissibility to other countries are among the many consequences of a DUI conviction.[1] These consequences weigh heavily, therefore,

---

[1] RCW 46.61.5055; 32 LINDA M. CALLAHAN, WASHINGTON PRACTICE: WASHINGTON DUI PRACTICE MANUAL: § 1:15-18 (2023-2024 ed.).

1

it is of the utmost importance that there is confidence in the reliability and accuracy

of technology the State uses to produce evidence in DUI criminal prosecutions.

The legislature tasked the state toxicologist, the State's expert in this area,

with choosing a breath test machine and regulating its operation. One of the

regulations created by the state toxicologist required the Alcotest 9510 to perform a

certain calculation at the time of the breath analysis, and, depending on the results,

the Alcotest 9510 would either proceed with the analysis or abort it before it could

print out the ultimate results. On May 9, 2020, Austin Keller was the subject of a

breath analysis performed by an Alcotest 9510. The Alcotest 9510 analyzing

Keller's breath did not perform that calculation as required by regulation. Despite

the state toxicologist testifying by declaration, under the penalty of perjury, that the

Alcotest 9510 complied with that regulation in practically every Department of

Licensing (DOL) administrative hearing in Washington that involved the Alcotest

9510, it seems as though no Alcotest 9510 in Washington performed a breath

analysis in accordance with that regulation.

When the Alcotest 9510 and those tasked with maintaining and operating it

do not follow proper standards and procedures, the Alcotest 9510 can produce

unreliable and inaccurate results, which in turn produce wrongful convictions. This

case was brought before this court prematurely, and the state toxicologist failed in

2

following their prescribed standards and procedures for the Alcotest 9510. These standards and procedures are central to the reliability and accuracy of the Alcotest 9510's results. I respectfully dissent.

ANALYSIS

I.  Suppression of the Alcotest 9510's Breath Analysis

The Alcotest 9510 is designed to give a "proper test" or "none at all" by detecting numerous potential issues affecting validity and aborting the breath analysis if the software detects a potential issue. Ex. 4A (WASHINGTON STATE PATROL (WSP) BREATH TEST PROGRAM TRAINING MANUAL (Nov. 2014). The Alcotest 9510 uses dual sensors to estimate the amount of alcohol in one's breath. One sensor uses infrared spectography (IR) and the other uses electric chemical fuel cell oxidation (EC). When the Alcotest 9510 does a breath analysis, it takes two samples and runs an IR and an EC test on each sample, creating four test results in total. One of the ways the Alcotest 9510 detects a potential issue affecting its validity is by calculating the mean of all four results, *rounding* that mean to four decimal places, and seeing whether the breath samples individually agree with the calculated mean within plus or minus 10 percent. Former WAC 448-16-060(2) (2010); RCW 46.61.506(4)(a)(vi). If the samples are within plus or minus 10 percent of the mean, and there are no other issues with the breath analysis, then the Alcotest 9510 will

3

complete the analysis and generate a printout of the ultimate results. If a sample is outside plus or minus 10 percent of the mean, there was likely an issue with the breath samples or the Alcotest 9510, and the Alcotest 9510 will display a "SAMPLES OUTSIDE 10%" message and abort the analysis without printing out a receipt. Ex. 4A.

The Alcotest 9510 should have been doing the specific mean calculation and comparison, as required by RCW 46.61.506(4)(a)(vi), RCW 46.61.506(3), and former WAC 448-16-060(2). However, we now know from a letter written by the Washington State Patrol and a declaration from the State Toxicologist, that the Alcotest 9510 does not *round* the mean to four decimal places, it *truncates*. CP at 133, 185. Truncating the mean could lead the Alcotest 9510 to erroneously print out results, where none should have been printed, violating RCW 46.61.506(4)(a)(vi), RCW 46.61.506(3), and former WAC 448-16-060(2).

The admissibility of the Alcotest 9510's printout of the ultimate results depends on the prosecution satisfying a two-step analysis under RCW 46.61.506. The first step requires a showing that the breath analysis is "valid," as the analysis was "performed according to methods approved by the state toxicologist." RCW 46.61.506(3). If the analysis is "valid," then the second step requires a prima facie showing of eight foundational requirements in RCW 46.61.506(4)(a), with the mean

calculation rounded to four decimals being the sixth foundational requirement. RCW 46.61.506(4)(a); former WAC 448-16-060(2). Only when both steps are satisfied are the breath analysis results admissible.

The majority holds that RCW 46.61.506(3), RCW 46.506(4)(a)(vi), and former WAC 448-16-060(2) do not require the Alcotest 9510 to do the mean calculation of the four results, rounded to four decimal places, at the time of the analysis. The majority believes this calculation can be done at trial by an expert witness. Majority at 37-38. Depending on the provision, the interpretation the majority adopts is either not supported by the plain reading or not supported by the legislative history, or it simply produces absurd and unintended results this court is tasked to avoid.

A. RCW 46.61.506(3) – Validity

To establish the first step, validity of the breath analysis, the State must establish that

> [*a*]*nalysis of the person's blood or breath* to be considered valid under the provisions of this section … shall have been *performed* according to *methods approved by the state toxicologist* and by an individual possessing a valid permit issued by the state toxicologist for this purpose.

RCW 46.61.506(3) (emphasis added); *State v. Wittenbarger*, 124 Wn.2d 467, 487, 880 P.2d 517 (1994) ("[P]ursuant to RCW 46.61.506(3), the Toxicologist has

5

approved regulations and protocols which must be followed in order for a breath test
to be considered valid.").

The majority's interpretation ignores the plain reading of this provision. If the
statute's meaning is plain on its face, then the court must give effect to that plain
meaning as an expression of legislative intent. *Dep't of Ecology v. Campbell &
Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). The analysis of the person's breath
is "performed" by the breath test instrument, in this case the Alcotest 9510, and its
operator, often a specifically credentialed law enforcement officer at the precinct,
not the State's expert witness at trial. "[P]erformed" in RCW 46.61.506(3) is the past
tense of "performance," signifying that the performance of methods approved by the
state toxicologist occurred in the past, when the analysis of the breath occurred, not
at trial. One of the "methods approved" by the state toxicologist is "the mean of all
four results will be calculated and rounded to four decimal places." Former WAC
448-16-060(2). Here, the breath test was not *performed* according to *methods*
approved by the state toxicologist—specifically, the *method* of mean calculation and
comparison approved by the state toxicologist. The breath analysis the Alcotest 9510
performed was not "valid" under RCW 46.61.506(3) and former WAC 448-16-
060(2). The State cannot satisfy step one of the two-step analysis for its results'
admissibility. Accordingly, the trial court was correct in its suppression as the results

of Keller's breath analysis by the Alcotest 9510 were not valid under RCW

46.61.504(3).

The majority writes that the breath analysis is "valid" as long as it followed

the 10-step protocol in WAC 448-16-050. Majority at 35. Although the steps in

WAC 448-16-050 are *necessary* for validity, nothing in WAC 448-16-050 or WAC

448-16-030(12), which defines "valid breath sample," makes the 10-step protocol

an exhaustive list and a sufficient condition for validity. We must not add words

where the legislature has chosen not to include them. *Lake v. Woodcreek*

*Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). RCW 46.61.506(3)

requires the analysis to be performed according to the methods approved by the State

Toxicologist, not just some of them. At the time of Keller's breath analysis, former

WAC 448-16-060(2) was an approved method required in breath analysis by the

state toxicologist. *Wittenbarger*, 124 Wn.2d at 487. ("[P]ursuant to RCW

46.61.506(3), the Toxicologist has approved regulations and protocols which *must*

be followed in order for a breath test to be considered valid." (emphasis added)).

B. RCW 46.61.506(4)(a)(vi) - Foundations of Admissibility

Within RCW 46.61.506(4)(a) is the second step, the eight foundational

requirements necessary for the State to establish the admissibility of the results of a

breath analysis. The relevant foundational requirement for Keller is

> [a] breath test performed by any instrument approved by the state toxicologist shall be admissible at trial or in an administrative proceeding if the prosecution or department produces prima facie evidence of the following:
>
>     ….
>     …. [t]he two breath samples agree to within plus or minus ten percent of their mean to be determined by the method approved by the state toxicologist.

RCW 46.61.506(4)(a)(vi).

The majority interprets this provision as not requiring the Alcotest 9510 to do the calculation or requiring the calculation to be done at the time it performs the analysis. Majority at 28. Their interpretation of RCW 46.61.506(4)(a)(vi) is problematic for three reasons.

First, the statute is ambiguous and the legislative history establishes that the calculation is to be done proximate to the test. Assuming the majority's interpretation is reasonable, then there is more than one reasonable interpretation of RCW 46.61.506(4)(a)(vi). This provision exists under RCW 46.61.506(4)(a), which concerns the performance of the breath analysis by an instrument, in this case the Alcotest 9510; and because of where this provision resides, it can reasonably be read to require the calculation be done proximate to the breath analysis. If the statutory language is susceptible to more than one reasonable interpretation, it is ambiguous and we may resort to extrinsic aids, such as legislative history, to resolve the ambiguity. *Filo Foods, LLC v. City of SeaTac*, 183 Wn.2d 770, 785-86, 357 P.3d

1040 (2015). The legislative history is illuminating. The legislature amended RCW

46.61.506 in 2004 to include the eight foundational requirements for admissibility.

LAWS OF 2004, ch. 68, § 4. When it came to the mean calculation provision, the bill

reports from both the House and Senate wrote "two samples *agreed* to within a

specified limit," implying with the use of the past tense "agreed," that the calculation

was to be done at the time of the analysis, not in the future at trial. H.B. REP. ON H.B.

3055, at 3, 58th Leg., Reg. Sess. (Wash. 2004); S.B. REP. ON S.H.B. 3055, at 2, 58th

Leg., Reg. Sess. (Wash. 2004). The legislature intended the mean calculation to be

done proximate to the breath analysis and according to the methods prescribed by

the state toxicologist.

Second, the majority's interpretation creates an unintended and absurd result.

A reading that results in absurd results must be avoided because it will not be

presumed that the legislature intended absurd results. *Gronquist v. Dep't of Corr.*,

196 Wn.2d 564, 571, 475 P.3d 497, 501 (2020). We need not leave our common

sense at the doorstep when we interpret a statute. *Allison v. Hous. Auth.*, 118 Wn.2d

79, 86, 821 P.2d 34 (1991). The eight foundational requirements under RCW

46.61.506(4) are required to be done proximate to the breath analysis, otherwise it

creates an absurd result, rendering the foundational requirements meaningless. Only

some of the foundational requirements have the unusual specificity of temporal

9

proximity to the breath analysis that is seemingly necessary for the majority. For example, there is RCW 46.61.506(4)(a)(ii) ("…at least fifteen minutes prior to administration of the test"), RCW 46.61.506(4)(a)(iii) ("…at the beginning of the fifteen-minute observation period"), and RCW 46.61.506(4)(a)(iv) ("[p]rior to the start of the test"). However, if we apply the majority's reasoning to the foundational requirements that *do not* have the unusual specificity of temporal proximity to the breath analysis, it renders the foundational requirement useless in establishing the reliability and accuracy of the breath analysis. Consider RCW 46.61.506(4)(a)(viii) ("All blank tests gave results of .000.") or RCW 46.61.506(4)(a)(v) ("The internal standard test resulted in the message 'verified.'"). With the majority's reading, the State need not establish that the Alcotest 9510 read a blank sample as 0.000 at the time of the subject's breath analysis. Not performing the blank sample test at the time of the breath analysis would render this foundational requirement completely meaningless, as performing the blank sample test several months to a year later at trial is not probative of whether the Alcotest 9510 could read a blank sample correctly at the time of the breath analysis. If the Alcotest 9510 cannot correctly read a blank sample as 0.000 *at the time of the analysis*, then the analysis of the suspect's breath sample will not be reliable or accurate. The same can be said if the Alcotest does not compare its breath test results to their mean rounded to the fourth decimal, as the Alcotest 9510 may print out the ultimate results in violation of WAC 448-16-

10

060(2), and the analysis of the subject's breath sample will not be reliable or accurate. To avoid absurd outcomes, RCW 46.61.506(4)(a)(vi) must be read as being done at the time of the analysis.

Third, even if the plain reading is unambiguous, this court may add or subtract from the clear language of a statute, rule, or regulation when the addition or subtraction of language is imperatively required to make the statute rational. *Dep't of Licensing v. Cannon*, 147 Wn.2d 41, 57, 50 P.3d 627 (2002). The mean agreement requirement under RCW 46.61.506(4)(a)(vi), just like all the other foundational requirements under RCW 46.61.506(4)(a), is not rational if not done proximate to the breath analysis. Without the Alcotest 9510 doing the required mean calculation and comparison at the time of the breath analysis, the Alcotest 9510 may print out the ultimate results when it should not.

When the Alcotest 9510 took its breath samples from Keller, it did not perform the mean calculation and comparison at the time of the analysis, as required in RCW 46.61.506(4)(a)(vi) and former WAC 448-16-060(2). This calculation is a foundational requirement under RCW 46.61.506(4)(a)(vi), necessary for the breath analysis results to be admissible at trial. The trial court was correct in suppressing the results.

C. Former WAC 448-16-060(2) – The method approved for mean calculation and comparison

When Keller provided breath samples to the Alcotest 9510 in 2020, the machine was required to perform the mean calculation and comparison according to the method prescribed in former WAC 448-16-060(2). The regulation prior to amendment in 2022 states:

> Pursuant to RCW 46.61.506 the following method is approved for determining whether two breath samples agree to within plus or minus 10 percent of their mean.
> ….
> (2) … For the Drager instrument, the mean of all four results will be calculated and *rounded* to four decimal places.

Former WAC 448-16-060 (emphasis added). The majority's interpretation of former WAC 448-16-060(2) contradicts the state toxicologist's own interpretation of the regulation. The majority holds that this does not require the Alcotest 9510 to do the calculation, nor does it require the calculation to be done at the time the machine performs the analysis, because it is written in the passive voice, uses the future tense with "will be," and does not have the necessary specificity of temporal proximity to the breath analysis. Majority at 31.

Former WAC 448-16-060(2) is a regulation created by the state toxicologist, with RCW 46.61.506 as the enabling statute. Rules of statutory construction apply to administrative rules and regulations. *Overlake Hosp. Ass'n v. Dep't of Health*,

170 Wn.2d 43, 51, 239 P.3d 1095 (2010). This court gives a *high level of deference* to an agency's interpretation of its regulations based on the agency's expertise and insight gained from administering the regulation. *Brady v. Autozone Stores, Inc.*, 188 Wn.2d 576, 581, 397 P.3d 120 (2017). Once it was clear to others outside the state toxicologist's office that the Alcotest 9510 was *truncating* rather than *rounding*, in violation of former WAC 448-16-060(2), the state toxicologist sought to amend former WAC 448-16-060(2). In July 2022, the state toxicologist filed a preproposal statement of inquiry; there she stated the reason for the amendment:

> WAC 448-16-060, in its current form, provides a method of determining agreement between duplicate breath samples by *rounding* the mean of the four results to the fourth decimal place. However, *the evidential instrument, known as the Draeger Alcotest 9510, truncates to the fourth decimal place. This rule change is necessary to align the WAC language and the method employed by the Draeger Alcotest 9510.*"

Wash. St. Reg. 22-14-099 (2022) (emphasis added) (boldface omitted). Here, it is explicit that the agency, specifically the state toxicologist, interpreted former WAC 448-16-060(2) as requiring the Alcotest 9510 to perform the calculation. The Alcotest 9510 was in violation of former WAC 448-16-060(2) as the "method employed" was not in "align[ment]" with the method required in former WAC 448-16-060(2). The same reason is mentioned in the proposed and permanent rules filings by the state toxicologist. Wash. St. Reg. 22-17-156 (2022); Wash. St. Reg. 22-21-032 (2022). Given the high level of deference to an agency's interpretation of

13

its own regulation, former WAC 448-16-060(2) required the Alcotest 9510 to perform the mean calculation, rounded to four decimals, at the time of the analysis.

When the Alcotest 9510 took its breath samples from Keller, it did not perform the mean calculation and comparison at the time of the test, as required in RCW 46.61.506(4)(a)(vi) and former WAC 448-16-060(2). Performance of this calculation in accordance with former WAC 448-16-060(2) is a necessary requirement under RCW 46.61.506(3) and RCW 46.61.506(4)(a)(vi) for the validity and admissibility of the results of the breath analysis. Therefore, the trial court was correct in suppressing the results.

D. *State v. Baker*

This court, in *State v. Baker,* held that "before the results of such tests may be admitted in evidence, [the State must establish] … [t]hat the machine was properly checked and in proper working order at the time of conducting the test." 56 Wn.2d 846, 852, 355 P.2d 806 (1960). The Alcotest 9510 is required to perform the mean calculation and comparison at the time of the analysis, per former WAC 448-16-060(2). Here, the Alcotest 9510 was not in "proper working order" at the time of the analysis because it did not perform the required mean calculation and comparison at the time of the analysis. The required mean calculation and comparison is also a check on the Alcotest 9510, as it must abort the analysis if a result falls outside the

14

parameters of the required mean calculation and comparison. Ex. 4A (WSP

TRAINING MANUAL). Here, the Alcotest 9510 was not "properly checked" at the time

of the test as it never performed the mean calculation and comparison at the time of

the analysis, per former WAC 448-16-060(2). Therefore, the Alcotest 9510 that

collected Keller's breath sample was not "properly checked," nor was it in "proper

working order" at the time of the breath analysis. Under *Baker*, the trial court was

correct in suppressing the breath analysis results because the results were

inadmissible. 56 Wn.2d at 852.

    E.  ER 702, 401, 402, and 403

    Dr. Fiona Couper became the state toxicologist in 2008. CP at 39. She had

submitted specifications for a breath analysis instrument to a bidding process in

2008. CP at 40. The bid specifications asked for the instrument to perform the mean

calculation with *truncation*. CP at 41. The bid specifications also asked for the

instrument to not print out the ultimate results if they did not satisfy the mean

calculation and comparison, pursuant to former WAC 448-16-060(2). CP at 41.

Ultimately, Dr. Couper approved the Alcotest 9510. CP at 42.

    Despite knowing that the Alcotest 9510 performed the mean calculation with

truncation since the bidding process in 2008, Dr. Couper testified by declaration

(dated May 8, 2015) in practically every DOL administrative hearing, under the

penalty of perjury, that

> [a]ll approved breath test instruments calculate whether the breath test
> results are within plus or minus 10% of their mean in accord with
> [former] WAC 448-16-060. If a breath sample is outside this parameter,
> no breath test result is generated.

CP at 460. Regrettably, we now know the Alcotest 9510 never performed the mean

calculation according to former WAC 448-16-060; instead, it truncated the mean to

four decimals rather than rounded the mean to four decimals. On June 16, 2021,

WSP sent a letter to the Washington Association of Prosecuting Attorneys stating:

> On June 3, 2021, Washington State Patrol Impaired Driving Section
> (IDS) was notified that the process used by the Draeger Alcotest 9510
> to determine agreement of duplicate breath samples is potentially not
> calculated in accordance with the [former] Washington Administration
> Code (WAC 448-16-060).

CP at 133. Given the misrepresentations and false statements known and testified to

by Dr. Couper about the Alcotest 9510's alleged compliance with former WAC 448-

16-060(2), the trial court excluded Dr. Couper's testimony pursuant to ER 702, 401,

402, and 403. CP at 104, 106, 109.  Dr. Couper's testimony was necessary for the

admission of the Alcotest 9510's breath analysis results, and her testimony's

exclusion prevented the admission of Keller's breath analysis results.

Review for evidentiary rules is an abuse of discretion standard. *State v. Arndt*,

194 Wn.2d 784, 799, 453 P.3d 696 (2019). An abuse of discretion occurs if the

16

court's decision is manifestly unreasonable or rests on untenable grounds. *State v. Griffin*, 173 Wn.2d 467, 473, 268 P.3d 924 (2012). A decision rests on untenable grounds if it rests on facts unsupported in the record or was reached by applying the wrong legal standard. *Id.* Despite this high standard of review, the majority reverses the trial court's evidentiary rulings under the premise that Dr. Couper's testimony was never false or misleading because RCW 46.61.504(3), RCW 46.506(4)(a)(vi), and former WAC 448-16-060(2) do not require the Alcotest 9510 to perform the mean calculation and comparison according to former WAC 448-16-060(2), nor do they require that it must be done proximate to the analysis. Majority at 41. The majority is incorrect. The trial court's underlying premise is correct, that RCW 46.61.504(3), RCW 46.506(4)(a)(vi), and former WAC 448-16-060(2) require the Alcotest 9510 to perform the mean calculation and comparison at the time of the breath analysis according to the method in former WAC 448-16-060(2). I would affirm the trial court's evidentiary rulings.

II.    RALJ 2.2(c)(2) – The Practical Effect of the Order

The State has a right to file an interlocutory appeal from a pretrial order suppressing evidence under RALJ 2.2(c)(2). RALJ 2.2(c)(2) states:

> The State or local government may appeal in a criminal case only from the following decisions of a court of limited jurisdiction and only if the appeal will not place the defendant in double jeopardy:

17

> ….
>
> …. [a] pretrial order suppressing evidence, if the trial court expressly finds that the practical effect of the order is to terminate the case.

In other words, the State can appeal the pretrial suppression of evidence only if the trial court finds that the State can no longer proceed with their case with the suppression of that evidence.

When the trial court suppressed the Alcotest 9510's analysis of Keller's breath, the State sought a direct appeal by this court pursuant to RALJ 2.2(c)(2), requiring the trial court to find that the "practical effect" of the suppression of the Alcotest 9510's results "is to terminate the case." The trial court granted the State's RALJ 2.2(c)(2) motion, allowing the State to seek direct review of the trial court's suppression order by this court. CP at 134.

As an issue of first impression, it is important to reach this issue with clarity. The majority glosses over the analysis to be used by a trial court considering a RALJ 2.2(c)(2) motion and primarily discusses the appellate standard of review of that decision. I will discuss both.

A. Appellate review of a RALJ 2.2(c)(2)

On this issue of first impression, the majority acknowledges that this is a question of mixed law and fact, generally reviewed de novo by the appellate courts, but chooses to review a RALJ 2.2(c)(2) decision under an abuse of discretion

18

standard. Majority at 24. The majority looks to RAP 2.2(b)(1) and CR 54(b) as an analogy to aid with interpretation. They hold that the level of appellate review for RALJ 2.2(c)(2) is abuse of discretion because RAP 2.2(d) contains similar language as CR 54(b), which appellate courts review trial court findings for abuse of discretion. Majority at 23.

This is not convincing. RAP 2.2(d) is not the RAP counterpart to RALJ 2.2(c)(2), which is what this motion was brought under. It is hard to understand why the majority justifies placing the level of appellate review for RALJ 2.2(c)(2) determinations in the exception of mixed questions of fact and law. Accordingly, the trial court's RALJ 2.2(c)(2) decision must be reviewed de novo because this is a question of mixed fact and law. Like summary judgment or judgment on the pleadings, both mixed questions of fact and law are reviewed de novo. In this case this determination was made pretrial, based predominately on the documents filed, specifically the incident report. CP at 124-35.

B. Trial court analysis under RALJ 2.2(c)(2)

"Practical" and "terminate" are not defined in the statute. We may discern the plain meaning of nontechnical statutory terms from their dictionary definitions. *State v. Kintz*, 169 Wn.2d 537, 547, 238 P.3d 470 (2010). "Practical" is defined as "of, relating to, or manifested in practice or action : not theoretical or ideal." MERRIAM-

19

WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/practical (last visited Apr. 1, 2024). "Terminate" is defined as "to bring to an end : CLOSE." *Id*. https://www.merriam-webster.com/dictionary/terminate (last visited Apr. 1, 2024). With those definitions, a trial court with a RALJ 2.2(c)(2) motion before it would have to determine whether the State, in actuality, can proceed with their case as charged. Whether or not it will be particularly difficult for the State to proceed is immaterial to this determination.

It is important first to understand the charge brought in this case and the alternative bases alleged in the information. Keller was charged with one count of DUI under RCW 46.61.502(1) with two alternative means alleged. CP at 1-2. RCW 46.61.502(1) makes it unlawful to drive a vehicle with a blood or breath alcohol concentration of 0.08 or higher, RCW 46.61.502(1)(a) (per se DUI), or while "under the influence of or affected by intoxicating liquor," RCW 46.61.502(1)(c) ("affected by" DUI). Keller was charged with both means. CP at 1-2.

The per se DUI requires, essentially, two pieces of evidence: proof the defendant was driving and the blood or breath alcohol test results. Independent of the per se DUI is the alternative "affected by" DUI, which focuses on evidence other than the mere test results. Evidence supporting the "affected by" DUI includes defendant's driving, officer's observations, field sobriety test performance,

defendant's admissions, and any other testimony to establish that the defendant was affected by alcohol. Significantly, this evidence is developed long before a blood or breath alcohol test is administered and this evidence is independent from the test results.[2]

The error that the majority and district court make is determining whether the evidence would support a conviction. The correct question is whether the evidence is sufficient to prosecute. In Keller's case, it is. Here, even with the suppression of the Alcotest 9510's breath analysis, there was sufficient facts to proceed with the "affected by" DUI. On May 9, 2020, law enforcement was dispatched to a "single vehicle collision into a ditch." CP at 4. The heavily damaged vehicle in the ditch was registered to Keller. CP at 4. Keller appeared to be "walking and talking" normally with the medics. CP at 4. Keller admitted to driving. CP at 4. Keller had the odor of intoxicants. CP at 4. Keller agreed to do the standardized field sobriety tests and had six out of six clues on the horizontal gaze nystagmus test[3], one out of eight clues on the walk and turn test, and zero out of four clues on the one-leg stand test. CP at 4.

---

[2] The suppression of a breath alcohol content (BrAC) result to a DUI prosecution is distinct from the suppression of actual contraband, such as the suppression of drugs in a drug possession case. An order excluding illegal drugs in a drug possession case would likely have the practical effect of terminating the case. Without admitting the drugs into evidence, it would be virtually impossible to prove the defendant possessed them. This is not true for a BrAC result to a DUI case. It is possible to prosecute a DUI without a blood or breath alcohol concentration test result.

[3] Observation of four or more clues, when the horizontal gaze nystagmus test is performed properly, implies a high likelihood that the subject's blood alcohol concentration is at or above 0.08. 32 CALLAHAN, *supra*, at §21.11 (quoting NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., TRANSP. SAFETY INST., INT'L ASS'N OF CHIEFS OF POLICE, DWI DETECTION AND STANDARDIZED FIELD SOBRIETY TEST (SFST) REFRESHER, PARTICIPANT MANUAL Session 3, at 9 (2015)).

After being read his *Miranda*[4] rights, Keller admitted he drank alcohol at his girlfriend's birthday party prior to driving. CP at 5. There existed sufficient indices of impairment to proceed with prosecuting Keller under the "affected by" DUI. Prosecution was not futile here. The "affected by" DUI remains separate, and the machine test results, without expert testimony tying the results to how the defendant is affected at the level of alcohol concentration disclosed, is simply irrelevant. While in this case, the State may not have a strong case to pursue the "affected by" theory, the evidence in support of that charged alternative remains unaffected by the suppression order and supports probable cause.

I would conclude the State failed to show the practical effect of suppressing the breath alcohol content results was to terminate the case, and therefore, the pretrial suppression order is not appealable. I would reverse the district court's order to the contrary and remand for trial.

CONCLUSION

In our courts, confidence in the reliability and accuracy of DUI technology and standards set by the state toxicologist in criminal prosecutions is and should be

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

of the utmost importance. Holding the state toxicologist to their own standards meets the goal of building trust and confidence in our DUI laws.

Here, the Alcotest 9510 at the time of the breath analysis did not perform the mean calculation and comparison as required under former WAC 448-16-060(2). I would affirm the trial court's suppression of the results of the breath analysis and the trial court's exclusion of the state toxicologist's testimony. In addition, I would reverse the trial court's order granting the State's RALJ 2.2(c)(2) motion.

Whitener, J.

Johnson, J.

23